No. 13-30739

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

STEPHEN MARSHALL GABARICK, on behalf of himself and all others
similarly situated, et al.

 Plaintiffs,

v.

LAURIN MARITIME (AMERICA) INCORPORATED, et al.

 Defendants.

---

AMERICAN COMMERCIAL LINES, LLC,

 Plaintiff – Appellant,

 v.

DRD TOWING COMPANY, LLC,

 Defendant – Appellee,

UNITED STATES OF AMERICA

 Intervenor – Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

---

## BRIEF OF APPELLEE UNITED STATES OF AMERICA

---

**STUART DELERY**
Assistant Attorney General
**DANA J. BOENTE**
United States Attorney
**SARAH S. KEAST**
**MICHAEL A. DiLAURO**
Torts Branch, Civil Division
United States Department of Justice
1425 New York Ave., Ste. 10100
Washington, D.C. 20005
Telephone:  202-616-4039
Attorneys for Appellee

## CERTIFICATE OF INTERESTED PERSONS

American Commercial Lines, LLC. v. DRD Towing Company, LLC
Case No. 13-30739

The undersigned counsel of record certifies that the following listed nongovernmental persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.  These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1.     Plaintiff-Appellant:  American Commercial Lines, LLC.

2.     Glen G. Goodier and Richard D. Bertram of Jones Walker LLP, Counsel for American Commercial Lines, LLC.

3.     John Nicoletti and Terry Stoltz of Nicoletti, Hornig & Sweeney, Counsel for American Commercial Lines, LLC.

4.     Defendant-Appellee:  DRD Towing Company, LLC, unrepresented in this action.

  /s/ Sarah Keast_____
Sarah Keast
Attorney of Record for United States of America

i

**STATEMENT REGARDING ORAL ARGUMENT**

In the United States' view, this case presents a straightforward application of judicial estoppel and the judicial process would not be significantly aided by oral argument.  If the Court should schedule oral argument, the United States would appreciate the opportunity to participate.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iv

STATEMENT OF JURISDICTION..........................................................................1

STATEMENT OF ISSUES PRESENTED.................................................................2

STATEMENT OF THE CASE..................................................................................3

STATEMENT OF FACTS .......................................................................................7

SUMMARY OF THE ARGUMENT ......................................................................10

ARGUMENT .........................................................................................................11

I.     STANDARD OF REVIEW...........................................................................11

II.    DISCUSSION...............................................................................................12

      A.     The District Court Did Not Abuse its Discretion in Holding that
ACL Was Judicially Estopped from Seeking To Have its Charters
Declared Void *ab Initio*.....................................................................12

      B.     Even Should the Court Disagree with the District Court's
Application of Judicial Estoppel, ACL's Complaint Fails as a
Matter of Law. .....................................................................................28

      C.     If Necessary, the District Court Should Issue Findings in the
First Instance Regarding Whether DRD Committed Fraud in the
Inducement. .........................................................................................36

      D.     The Denial of ACL's Partial Motion for Summary Judgment is
Not Before this Court. .........................................................................39

CONCLUSION ......................................................................................................41

# TABLE OF AUTHORITIES

## CASES

*Ahrens v. Perot Corp.*,
　　205 F.3d 831 (5th Cir. 2000) ..................................................13, 14

*Albany Ins. Co. v. Kieu*,
　　927 F.2d 882 (5th Cir. 1991) .........................................................32

*Anderson v. Bessemer City*,
　　470 U.S. 564 (1985)........................................................................37

*Arthur J. Gallagher & Co. v. Babcock*,
　　703 F.3d 284 (5th Cir. 2012) ........................................................14

*Baker v. Raymond Int'l, Inc.*,
　　656 F.2d 173 (5th Cir. 1981) ..................................................20, 35

*Black Gold Marine Inc. v. Jackson Marine Co., Inc.*,
　　759 F.2d 466 (5th Cir. 1985) ..................................................37, 41

*Black v. J.I. Case Co.*,
　　22 F.3d 568 (5th Cir. 1994) ..........................................................40

*Bridgestone/Firestone v. Recovery Credit Servs.*,
　　98 F.3d 13 (2d Cir. 1996) ..............................................................38

*Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*,
　　179 F.3d at 210 ......................................................................13, 21

*In re Cromer (Krohn v. Orta)*,
　　153 B.R. 391 (E.D.N.Y. 1993) ......................................................34

*DK Joint Venture 1 v. Weyand*,
　　649 F.3d 310 (5th Cir. 2011) ........................................................14

*DeMarco v. United States*,
　　415 U.S. 449 (1974)........................................................................37

*Downey v. Denton County*,
 119 F.3d 381 (5th Cir. 1997) .........................................................................40

*Empire Seafoods v. Anderson*,
 398 F.2d 204 (5th Cir. 1968) .......................................................................20

*Ergo Science, Inc. v. Martin*,
 73 F.3d 595 (5th Cir. 1996) ...................................................................12, 16

*Feder v. Elec. Data Sys. Corp.*,
 429 F.3d 125 (5th Cir. 2005) .......................................................................14

*Flugence v. Axis Surplus Ins. Co. (In re Flugence)*,
 Case No. 13-30073, 2013 U.S. App. LEXIS 23582 (5th Cir. Nov. 22,
 2013) ......................................................................................................13

*French v. Allstate Indem. Co.*,
 637 F.3d 571 (5th Cir. 2011) ...................................................................15, 21

*Gabarick v. Laurin Maritime (America) Inc.*,
 Case No. 08-4007 (E.D.La.) ..........................................................................4

*Gonzalez v. Trinity Marine Group*,
 117 F.3d 894 (5th Cir. 1997) .......................................................................39

*Gore v. El Paso Energy Corp.*,
 Case No. 02-1008, 2008 U.S. Dist. LEXIS 9684 (M.D. Tenn. Feb. 8,
 2008) ......................................................................................................23

*Hall's Reclamation v. APAC Carolina*,
 Case No. 95-2870, 1996 U.S. App. LEXIS 33040 (4th Cir. 1996)...............38

*Hall v. GE Plastic Pac. PTE Ltd.*,
 327 F.3d 391 (5th Cir. 2003) ................................................................passim

*Hopkins v. Cornerstone Am.*,
 545 F.3d 338 (5th Cir. 2008) .......................................................................14

*Huffman v. Union Pac. R.R.*,
 675 F.3d 412, 417 (5th Cir. 2012) ..............................................................14

*Jackson v. City of Atlanta*,
    73 F.3d 60 (5th Cir. 1996) ...........................................................................39

*Jethroe v. Omnova Solutions, Inc.*,
    412 F.3d 598, 601 (5th Cir. 2005) ........................................................13, 15

*Johnson v. Greater Southeast Community Hosp. Corp.*,
    951 F.2d 1268 (D.C. Cir. 1991).................................................................40

*Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
    364 F.3d 274 (5th Cir. 2004) .....................................................................14

*Kaiser Steel Corp. v. Mullins.*,
    455 U.S. 72 (1982).....................................................................................35

*Knight v. U.S. Fire Ins. Co.*,
    804 F.2d 9 (2d Cir. 1986) ..........................................................................32

*Liberto v. D.F. Stauffer Biscuit Co.*,
    441 F.3d 318 (5th Cir. 2006) .....................................................................14

*Mucha v. King*,
    792 F.2d 602 (7th Cir. 1986) .....................................................................37

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)............................................................................passim

*Pedraza v. Shell Oil Co.*,
    942 F.2d 48 (1st Cir. 1991)........................................................................39

*Pegram v. Herdrich*,
    530 U.S. 211 (2000)...................................................................................12

*Probo II London v. ISLA SANTAY MV*,
    92 F.3d 361 (5th Cir. 1996) .......................................................................20

*Pullman-Standard, Div. of Pullman v. Swint*,
    456 U.S. 273 (1982)...................................................................................37

*RSR Corp. v. Int'l Ins. Co.*,
    612 F.3d 851 (5th Cir. 2010) .......................................................................13

*Republic of Ecuador v. Connor*,
    708 F.3d 651, 654 (5th Cir. 2013) ..........................................................14, 21

*Superior Crewboats Inc. v. Primary P&I Underwriters (In re Superior
    Crewboats)*,
    374 F.3d 330 (5th Cir. 2004) .................................................................13, 21

*Texaco Inc. v. Duhe*,
    274 F.3d 911 (5th Cir. 2001) .......................................................................14

*United States ex rel. Siewick v. Jamieson Science & Eng'g, Inc.*,
    214 F.3d 1372 (D.C. Cir. 2000)...............................................................34, 35

*United States v. McCaskey*,
    9 F.3d 368 (5th Cir. 1993) ...........................................................................12

*United States v. Renda*,
    709 F.3d 472 (5th Cir. 2013) .......................................................................14

*United States v. Shah*,
    44 F.3d 285 (5th Cir. 1995) .........................................................................39

## STATUTES

33 U.S.C. §§ 2703(a), 2704 .....................................................................................4

28 U.S.C. § 1291 .....................................................................................................1

28 U.S.C. § 1333 .....................................................................................................1

28 U.S.C. § 2361 ................................................................................................5, 25

## RULES

Fed. R. Civ. P. 8(d)(2)............................................................................................23

Fed. R. Civ. P. Supp. R. F(3) ...............................................................5, 25

Fed. R. Civ. P. 52(e)..............................................................................36

## OTHER

Restatement (Second) of Contracts..................................................28, 29, 32, 33, 35

Joseph M. Perillo, Corbin on Contracts (rev. ed. 2002) ......................29, 30, 31, 34

John Edward Murray, Jr., Murray on Contracts (5th ed.) (2011)...............30, 31, 33

17A Am. Jur. 2d Contracts § 10 ..............................................................30

Joseph M. Perillo, Calamari & Perillo on Contracts (6th ed.) (2009). ....................31

## STATEMENT OF JURISDICTION

The district court exercised jurisdiction over this matter pursuant to 28

U.S.C. § 1333.  Jurisdiction is invoked in this Court pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED

1.      Whether the district court abused its discretion in holding that ACL was judicially estopped from seeking to have its charters with DRD declared void *ab initio* where ACL's successful defense in the limitation actions was based on the existence of those charters?

2.      If the district court's dismissal is not affirmed, can the alleged fraud in the inducement and illegality of the charters support a declaration that the charters were void *ab initio* as a matter of law?

3.      If the district court's dismissal is not affirmed, should the district court, rather than this Court, issue factual findings in the first instance regarding whether DRD committed fraud in the inducement of the charters?

4.      If the district court's dismissal is not affirmed, may this Court review the denial of ACL's partial motion for summary judgment given the wholly separate nature of the dismissal order under review and the parties' agreement to proceed on the limitation actions' trial record?

## STATEMENT OF THE CASE

This declaratory judgment action is one of several cases arising from the collision of ACL's oil-laden barge DM-932, pushed by the tug MEL OLIVER, with the tanker TINTOMARA on July 23, 2008, and the resulting oil spill.  ACL also owned the MEL OLIVER, which was operated by DRD Towing Company, LLC under a pair of charter agreements.

In this action, ACL seeks to have the charters for the MEL OLIVER declared void *ab initio*, that is, void from their inception.  ACL's Amended Complaint alleged that DRD entered the charters specifically intending to violate the manning and regulatory compliance terms in those contracts, and that this constituted fraud in the inducement.  ROA.22016-22018 ¶¶ 10-15; 22024-22025 ¶¶ 31-33.  ACL maintains that this type of fraud can render a contract void *ab initio*.[1]  ROA.22024-22025 ¶¶ 31-33.  ACL has abandoned any effort to recover contract damages or restitution from DRD.

ACL has represented that it seeks this declaration in order to defeat the United States' right to recover from ACL as a responsible party under the Oil Pollution Act,[2] and to allow ACL to seek to have its own cleanup expenses reimbursed from the Oil Spill Liability Trust Fund.  *See, e.g.*, ROA.18449.  ACL, a

---

[1]     The United States disagrees with this fundamental premise of ACL's lawsuit, as discussed in more detail below.

[2]     The United States has brought an action in the Eastern District of Louisiana seeking such a recovery, Case No. 11-2076.

responsible party under OPA as the owner of the source of the spill, wishes to assert OPA's complete defense to liability, § 2703(a), and OPA's limits on liability, § 2704.  Neither of these provisions is available to ACL, however, because (among other reasons) ACL has a contractual relationship (the charters) with DRD, whose gross negligence and regulatory violations were a proximate cause of the spill.  *See* 33 U.S.C. §§ 2703(a), 2704.  ACL believes that if the charters are declared void *ab initio* it will be entitled to assert these defenses.[3]

Numerous cases arising from this spill were consolidated, also before Judge Ivan Lemelle, the lead case being *Gabarick v. Laurin Maritime (Am.) Inc.*, Case No. 08-4007 (E.D.La.).  At the core of this consolidation were four complaints for exoneration or limitation of liability for the collision under maritime law:  Case No. 08-4023 (the TINTOMARA interests'[4] exoneration/limitation complaint for the tanker TINTOMARA); Case No. 08-4046 (ACL's exoneration/limitation complaint as owner of the barge DM-932); Case No. 08-4261 (DRD's limitation complaint as owner *pro hac vice* of the tug MEL OLIVER); and Case No. 08-4600 (ACL's exoneration/limitation complaint as owner of the tug MEL OLIVER).  For simplicity, the United States refers to these four actions, which were tried together, as "the limitation actions."

---

[3]    The United States disagrees that the declaration ACL seeks would allow ACL to avail itself of the Oil Pollution Act's defenses, but that question is not currently before the Court.

[4]    Whitefin Shipping Co., Ltd., Laurin Maritime AB, Laurin Maritime (America) Inc., Anglo-Atlantic Steamship Limited, and M/V TINTOMARA.

4

Additionally, DRD's primary insurer filed an interpleader action (Case No. 08-4156), which was also consolidated, and it deposited the policy limits in the registry of the Court.  ROA.158; ROA.487; ROA.509.  DRD's excess insurers intervened and likewise deposited policy limits in the registry of the court. ROA.235; ROA.243; ROA.8307; ROA.9623.

On October 26, 2010, the TINTOMARA interests sought to have the declaratory judgment action stayed and consolidated with the limitation actions, moving to enforce the limitation actions' stay under Federal Rule of Civil Procedure Supplemental Rule F(3) and for a stay pursuant to 28 U.S.C. § 2361 on the grounds that the declaratory judgment action would affect property in the interpleader.  ROA.10417-10420.  The district court agreed, consolidating this action with the other proceedings and formally staying the declaratory judgment action "pending resolution of related issues currently pending in the [limitation/interpleader] action."  ROA.13604.

In August 2011, the court held a bench trial in the four limitation actions, and a final judgment was entered on September 28, 2012.  ROA.283.  During this trial, ACL argued that it was not liable for the negligence of its vessel's crew because DRD was the owner *pro hac vice* of the vessel under the charters between ACL and DRD.  *See, e.g.*, ROA.17162.  The district court accepted ACL's argument, finding "there was a valid bareboat charter that invested DRD with

5

ownership *pro hac vice* along with a valid time charter that recognized DRD's

status as 'owner' vis-a-vis ACL's charterer position in the latter charter."

ROA.17869. As a result of this finding, the court found DRD as owner *pro hac*

*vice*, rather than ACL as owner, responsible for the crewing and navigational errors

of the MEL OLIVER. ROA.17867-17868, 17888. *See also* ROA.17890-17891

(assigning no liability to ACL).

The district court proposed, in a March 6, 2013 order, that this declaratory

judgment action be tried on the trial record already generated in the trial of the

limitation actions. ROA.18338-18339. ACL and DRD agreed to this approach in

a joint status report filed March 26, 2013, subject to a lifting of the bankruptcy

stay, which went into place when DRD filed for bankruptcy on March 5, 2012.

ROA.18377-18378. During a status conference in the United States' OPA lawsuit,

Case No. 11-2076, the district court invited the United States to intervene in the

declaratory judgment action, given that ACL's purpose in seeking the declaration

was to affect the United States' rights. *United States v. Am. Commercial Lines*,

Case No. 11-2076 (E.D.La.), ECF No. 89. The district court further requested that

the parties propose a schedule to submit trial briefs to resolve the declaratory

judgment action based on the limitation actions' trial record. *Id.* The United

States moved to intervene, ROA.299, and the Court granted that unopposed motion

on May 7, 2013, ROA.300. At the same time, ACL sought and obtained a lifting

6

of the bankruptcy stay. *In re DRD Towing, LLC*, Bankr. E.D. La., Case No. 13-10524, ECF No. 6.

ACL and the United States provided the requested briefing, based on the trial record from the limitation actions. DRD did not participate. On June 11, 2013, the district court ordered "that ACL's complaint seeking declaratory judgment to void the charters between itself and DRD is barred by judicial estoppel" and therefore dismissed it. ROA.18794. A final judgment was entered in favor of DRD. ROA.18800.

The judgment in the limitation actions is also on appeal, at 12-31109 (5th Cir.), as is a decision relating to the proper parties to the United States' OPA action against ACL, at 13-30358 (5th Cir.).

## STATEMENT OF FACTS

ACL is in the marine transportation business, operating a large fleet of barges and tugs. Between 2006 and 2008, the tug-and-barge transportation industry was dealing with a shortage of licensed crew. ROA.20681-20682 (J. Sellers 42:25-43:4); ROA.20818 (B. Christy 39:14-16); ROA.21098 (R. Sikora 134:18-22.) Because of this shortage and to achieve economic savings, ACL contracted outside companies, including DRD, to operate ACL-owned tugs. ROA.17861; ROA.21259 (Master 37:3-8). This included ACL's PAM D, for which the MEL OLIVER was later substituted. ROA.17861.

7

This arrangement was accomplished by the simultaneous execution of two agreements for each vessel. ROA.17861. By the first agreement, entitled "Bareboat Charter," ACL chartered the PAM D to DRD for $1 a day. ROA.17861; ROA.18505-18530 (bareboat charter, Tr. Ex. 700). DRD, in turn, provided a crew and chartered the vessel back to ACL at under a time charter entitled "Fully Found Charter." ROA.17861; ROA.18531-18546 (time charter, Tr. Ex. 701). These agreements were simultaneously executed on August 6, 2007. ROA.18505; ROA,18531. An amendment to these charters substituted the MEL OLIVER for the PAM D on June 10, 2008. ROA.18547-18548.

On July 22, 2008, at ACL's direction, the MEL OLIVER picked up ACL's barge DM-932 from ACL's Harahan fleet, the operation center for ACL's Gulf Coast operation. ROA.19287. Two days earlier, while the MEL OLIVER was underway to the Harahan fleet, the licensed operator of the MEL OLIVER, Terry Carver, had departed the tug on personal business, leaving the MEL OLIVER improperly crewed, in violation of Coast Guard regulations. ROA.19286. The MEL OLIVER was being operated only by steersman John Bavaret when it arrived at the Harahan fleet. ROA.19286-19287. With Bavaret as sole operator, it transported DM-932 downriver to the Stone Oil facility, where the barge was loaded with fuel oil. ROA.19289. Shortly after midnight on July 23, after the

loading was complete, the MEL OLIVER departed with DM-932 to return to

ACL's Harahan fleet.  ROA.19286, 19306-19308.

     During the trip, the MEL OLIVER veered off its course without warning

into the path of the TINTOMARA.  The TINTOMARA struck ACL's barge,

severed the wires connecting the barge to the MEL OLIVER, and carried the barge

downriver.  The barge eventually sank just upriver of the Crescent City Connection

Bridge, discharging its cargo of fuel oil into the Mississippi River.

     In the limitation actions tried in August, 2011, ACL argued that the bareboat

charter made DRD the owner *pro hac vice* of the MEL OLIVER, relieving ACL of

liability for the vessel operator's errors.  *See, e.g.*, ROA.17162.  Despite the

TINTOMARA interests' argument that the two-charter arrangement did not

include a true bareboat charter because ACL had not completely relinquished

possession, command, and navigation of the MEL OLIVER, the district court held

in ACL's favor.  ROA.17864-17869.  It found:  "there was a valid bareboat charter

that invested DRD with ownership *pro hac vice* along with a valid time charter that

recognized DRD's status as 'owner' vis-a-vis ACL's charterer position in the latter

charter."  ROA.17869.  ACL was, therefore, not liable under general maritime law

for the navigational errors of the MEL OLIVER.  ROA.17868.

## SUMMARY OF THE ARGUMENT

Given that ACL's successful defense in the limitation actions was based on the existence of its charters with DRD, the district court did not abuse its discretion in holding that ACL was judicially estopped from seeking to have those charters declared void *ab initio*. Judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). Here, ACL convinced the district court that it had no liability in the limitation actions because of the existence of "valid and customary charters," yet now asks this Court to declare that those same charters were never formed. Judicial estoppel properly forecloses the possibility of these two antithetical judgments by prohibiting ACL from asserting a position (the charters never existed) that is "clearly inconsistent" with the one on which it previously prevailed (valid charters rendered DRD the owner *pro hac vice* of the MEL OLIVER, relieving ACL of liability).

Even if this Court should disagree with the district court's judicial estoppel decision, there is no need to remand the case for factual findings because, as a matter of law, the alleged fraud in the inducement and regulatory violations cannot render the charters void *ab initio*. As a matter of black-letter contract law, fraud in the inducement, even if proven, merely renders a contract voidable, not void from

10

the start.  Likewise, DRD's alleged intention to breach the charters by committing regulatory violations during the course of its performance cannot render the *charters themselves* contrary to public policy and void, as a matter of law.

In the event this Court overturns the district court's dismissal and determines that the question of whether DRD committed fraud in the inducement should be reached, it should remand the matter because the district court should make the necessary factual findings in the first instance.  This Court should decline ACL's invitation to take on that role.  ACL agreed that the matter should be determined on the trial record from the limitation actions, and the district court is in the best position to weigh that evidence, including the credibility of the witnesses who testified live.  Similarly, if this Court overturns the district court's dismissal order, it will lack jurisdiction to review the denial of ACL's partial motion for summary judgment, a non-final order.

## ARGUMENT

### I.    STANDARD OF REVIEW

This court reviews a district court's invocation of judicial estoppel for abuse of discretion.  *Hall v. GE Plastic Pac. PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003).

II.    **DISCUSSION**

    A.    **The District Court Did Not Abuse its Discretion in Holding that ACL Was Judicially Estopped from Seeking To Have its Charters Declared Void *ab Initio*.**

The district court did not abuse its discretion when it ordered that "ACL's complaint seeking declaratory judgment to void the charters between itself and DRD is barred by judicial estoppel." ROA.18794. ACL prevailed in the limitation actions based on the existence of the charters between it and DRD. ACL now seeks to have those same charters declared void from their inception. Application of judicial estoppel was well within the district court's discretion.

Judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 217 n.8 (2000)). The doctrine is intended to protect the integrity of the judicial process. *New Hampshire*, 532 U.S. at 749-50. "The policies underlying the doctrine include preventing internal inconsistency, precluding litigants from 'playing fast and loose' with the courts, and prohibiting parties from deliberately changing positions according to the exigencies of the moment." *United States v. McCaskey*, 9 F.3d 368, 378 (5th Cir. 1993); *see also Ergo Science, Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir. 1996).

12

The Fifth Circuit has adopted at least "'two bases for judicial estoppel' [that] must be satisfied before a party can be estopped. First, it must be shown that 'the position of the party to be estopped is clearly inconsistent with its previous one; and [second,] that party must have convinced the court to accept that previous position.'" *Hall v. G.E. Plastic Pacific PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003) (quoting *Ahrens v. Perot Corp.*, 205 F.3d 831, 833 (5th Cir. 2000)). Fifth Circuit cases where the estoppel is based on the non-disclosure of a claim in a prior bankruptcy have typically identified a third factor: that "the non-disclosure must not have been inadvertent." *Superior Crewboats Inc. v. Primary P&I Underwriters (In re Superior Crewboats)*, 374 F.3d 330, 335 (5th Cir. 2004).[5] This Court has not applied this additional inadvertence requirement in cases, such as this one, where the estoppel is *not* based on a non-disclosure of a claim in a prior bankruptcy. *See, e.g.*, *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 859 (5th Cir.

---

[5]    This court recognized "inadvertence" as a possible exception to judicial estoppel in 1999 in *Browning Mfg. v. Mims (In re Coastal Plains, Inc.)*, a bankruptcy non-disclosure case laying out a narrow view of when "the debtor's failure to satisfy its statutory disclosure duty is 'inadvertent.'" 179 F.3d 197, 202, 210 (5th Cir. 1999). In 2004, this court decided *In re Superior Crewboats*, another judicial estoppel case based on the failure to disclose a claim in a prior bankruptcy. 374 F.3d 330. That court stated as a third requirement for judicial estoppel that "the non-disclosure must not have been inadvertent," citing *Coastal Plains*. *Id.* at 335. Since then, inadvertence has typically been listed as a third factor in cases based on a bankruptcy non-disclosure. The burden of showing inadvertence remains on the party seeking to assert the claim it failed to disclose. *See Jethroe v. Omnova Solutions, Inc.*, 412 F.3d 598, 601 (5th Cir. 2005) ("To establish that her failure to disclose was inadvertent, [plaintiff] may prove either that she did not know of the inconsistent position or that she had no motive to conceal it from the court."); *Flugence v. Axis Surplus Ins. Co. (In re Flugence)*, Case No. 13-30073, 2013 U.S. App. LEXIS 23582, at *10 (5th Cir. Nov. 22, 2013) (same).

2010) ("For a party to be judicially estopped from asserting a position, two requirements must be met.").[6]

Here, the district court found that the first element of judicial estoppel was met: "By now arguing that the charters were void *ab initio*, ACL takes a position inconsistent with its earlier arguments, where it relied on the 'valid and customary charters' to avoid liability for DRD's negligence." ROA.18798. The second element was likewise met: "this Court has already accepted ACL's argument that valid bareboat charters existed." ROA.18799. These conclusions are amply supported in the record. ACL explicitly argued in its post-trial limitation-action briefing that "there is no evidence that they [the charters] were anything other than what they purported to be, *valid and customary charters*," ROA.17161 (emphasis added), and that ACL was not liable on the basis of "established maritime law that an owner of a vessel bareboat chartered to another is not liable for the negligent navigation of the crew . . . ." ROA.17162.[7] Likewise, the district court accepted

---

[6]    *See also United States v. Renda*, 709 F.3d 472, 486-487 (5th Cir. 2013); *Republic of Ecuador v. Connor*, 708 F.3d 651, 654 (5th Cir. 2013); *Arthur J. Gallagher & Co. v. Babcock*, 703 F.3d 284, 291 n.18 (5th Cir. 2012); *Huffman v. Union Pac. R.R.*, 675 F.3d 412, 417 (5th Cir. 2012); *DK Joint Venture 1 v. Weyand*, 649 F.3d 310, 318 n.10 (5th Cir. 2011); *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 347 (5th Cir. 2008); *Liberto v. D.F. Stauffer Biscuit Co.*, 441 F.3d 318, 328 (5th Cir. 2006); *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 136 (5th Cir. 2005); *Karaha Bodas Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 364 F.3d 274, 294 (5th Cir. 2004); *Hall*, 327 F.3d at 396; *Texaco Inc. v. Duhe*, 274 F.3d 911, 923 (5th Cir. 2001); *Ahrens v. Perot Sys. Corp.*, 205 F.3d 831, 833 (5th Cir. 2000).

[7]    ACL also maintained that it was not liable under maritime law "for negligent acts committed by an independent contractor, such as DRD, while the independent contractor is

14

ACL's argument, finding "there was a valid bareboat charter that invested DRD with ownership *pro hac vice* along with a valid time charter that recognized DRD's status as 'owner' vis-a-vis ACL's charterer position in the latter charter," and assigning no liability to ACL.  ROA.17869; 17890-17891.

Consistent with this Court's precedents for cases not involving failures to make bankruptcy disclosures, the district court did not apply a separate "inadvertence" requirement.  ROA.18797.  *See also Hall*, 327 F.3d at 399 (rejecting an "intent" element).  Even if this Court should determine that an inadvertence requirement applies in this case, the district court's decision remains sound.  ACL's two inconsistent positions are not inadvertent (as a non-disclosure might be):  rather, they are two affirmative litigation positions intentionally taken in the limitation actions and the declaratory judgment action, respectively.  Further, ACL, which would bear the burden of showing inadvertence, *see Jethroe*, 12 F.3d at 601, has not argued that its advocacy of either position was inadvertent, and so has waived any such claim.[8]  *See, e.g.*, *French v. Allstate Indem. Co.*, 637 F.3d 571, 582-83 (5th Cir. 2011) (stating waiver rule).

---

performing its assigned duties," ROA.17169, a defense which the district court also accepted. ROA.17869.

[8]     The Supreme Court, while declining to "establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel," also identified a third consideration (in addition to an inconsistent position and prior judicial acceptance):  "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on an opposing party if not estopped."  *New Hampshire*, 532 U.S. at 750-51.

Finally, the district court considered the purposes underlying the judicial estoppel doctrine, underscoring two of these policies:  "The doctrine [of judicial estoppel] <u>prevents internal inconsistency</u>, precludes litigants from 'playing fast and loose' with the courts, and <u>prohibits parties from deliberately changing positions based upon the exigencies of the moment</u>.  ROA.18796 (citing *Ergo Science*, 73 F.3d at 598) (emphasis in Order).  The district court stated that it was ordering that ACL was judicially estopped from bringing the declaratory judgment action "to prevent internal inconsistency."  ROA.18799.  *See also New Hampshire*, 532 U.S. at 755 ("Were we to accept New Hampshire's latest view, the 'risk of inconsistent court determinations' would become a reality.").  The district court likewise invoked the policy of "prohibiting parties from deliberately changing positions based upon the exigencies of the moment," finding that ACL appeared to have "changed its positions in the instant action 'simply because [its] interests have changed,' and it seeks declaratory judgment in order to avoid liability in the related suit brought by the Government."  ROA.18798.

The district court was well within its discretion in its application of judicial estoppel on this basis.  Nonetheless, ACL makes three arguments to suggest the

---

This court has examined this factor in some cases, but has not made it a requirement in this Circuit.  *See, e.g.*, *Hall*, 327 F.3d at 399.  In any event, ACL would derive unfair advantage if it was permitted to prevail against two different litigants on fundamentally incompatible arguments (*i.e.*, valid charters made DRD the owner *pro hac vice* of the MEL OLIVER/the charters were never valid).

16

district court abused its discretion.  First, it argues that its position in the limitation

action is not, in fact, inconsistent with declaring the charters void *ab initio* because

(contrary to the record) it had been arguing only that the charters were *intended* to

be valid, not that they were actually valid.  Br. 16.  Second, it argues (contrary to

well-established law) that judicial estoppel requires that there have been a "failure

to disclose" a position.  Br. 21-22.  Third, ACL argues that its positions were not

inconsistent "in the context of the consolidated action."  Br. 22-28.

> 1.    *ACL Argued—and the District Court Found—that the Charters Were Valid in the Limitation Action.*

In its Summary of the Argument,[9] ACL claims that in the limitation action it

was merely "showing that the agreements were *intended to be* valid charters" and

that the district court merely concluded "that the agreements between ACL and

DRD *were intended to be* valid charters."  Br. 16 (emphasis added).  In this way,

ACL claims that its positions are not inconsistent after all:  the charters can be void

*ab initio* since ACL was only claiming that the charters were *intended* to be valid,

not that they actually were valid.  *Id*.

The foremost failing of this argument is that it is not true on the record.

ACL did not simply argue that the charters were "intended" to be valid; it argued

that they *were* valid:  "there is no evidence that they [the charters] were anything

---

[9]    ACL never addresses these summary assertions, which are made without citation to the record, in the Argument section of its brief.

other than what they purported to be, *valid and customary charters*." ROA.17161 (emphasis added).[10] Likewise the district court did not merely find "that the agreements between ACL and DRD *were intended to be valid charters*," as ACL claims at Br. 16. It found: "there was a valid bareboat charter that invested DRD with ownership *pro hac vice* along with a valid time charter that recognized DRD's status as 'owner' vis-a-vis ACL's charterer position in the latter charter." ROA.17869. *See also* ROA.18799 ("[T]his Court has already accepted ACL's

---

[10]    See also:

- "There is no evidence that this contract [the bareboat charter] between ACL and DRD was anything other than a traditional bareboat charter." ROA.17161.
- "ACL, as the owner of the MEL OLIVER under bareboat charter to DRD is not liable for the negligence of DRD or its crew." ROA.17162. *See also* ROA.17327 (same in ACL Post Trial Reply Brief); ROA.17445 (same in ACL Post Argument Brief).
- "There is no question that under the facts of this case and the charter agreements that DRD was an independent contractor to ACL." ROA.17169.
- "The evidence conclusively establishes that the MEL OLIVER was being operated by DRD pursuant to a bareboat charter agreement." ROA.17321.
- "The charter parties . . . meet all of the legal requirements for a bareboat charter and a fully found charter, also known as a time charter." ROA.17321.
- "DRD became owner *pro hac vice* . . . ." ROA.17322.
- "[ACL's providing dispatch instructions] does not negate the existence of the bareboat charter." ROA.17322.
- "Once ACL bareboat chartered its vessel to DRD, DRD became the owner *pro hac vice* and for all intents and purposes DRD was the owner of the MEL OLIVER." ROA.17330-17331.
- "The charters do protect ACL from the negligent navigation by DRD's crews." ROA.17445.
- "The bareboat charter unquestionably gave DRD full possession, command and navigation of the MEL OLIVER." ROA.17460.

Indeed, in over 200 pages of post-trial briefing from ACL, the United States has found no argument that ACL was relieved of *in personam* liability because the charters were *intended* to be valid, rather than actually valid. *See generally* ACL Post Trial Brief beginning ROA.17104 (and particularly pages 54-64), ACL Post Trial Reply Brief beginning ROA.17303 (and particularly pages 16-26), ACL Post Argument Brief beginning ROA.17442, ACL Trial Brief beginning ROA.17451 (and particularly pages 10-12).

argument that valid bareboat charters existed."). Likewise, in its brief to the Fifth Circuit in the appeal of the limitation actions (Case No. 12-31109), ACL argued that "the District Court correctly concluded that ACL and DRD entered into a valid bareboat charter, followed by a valid time charter."[11] ACL's Reply Brief as Appellant and Response as Cross-Appellee, Case No. 12-31109, ECF No. 00512289805, at 34.

Furthermore, as a matter of law, ACL could only have been relieved of liability (as it was) for the navigational errors and improper crewing of its vessel if the charters were *in fact* valid. A shipowner will face *in personam* liability "if the

---

[11]    Elsewhere in its briefing in the cross-appeal of the limitation actions, ACL similarly asserted:

- "The District Court's finding that DRD became owner *pro hac vice* of the MEL OLIVER (pursuant to the bareboat charter) and exercised operational control over the vessel, is overwhelmingly supported by credible evidence." ACL's Reply Brief as Appellant and Response as Cross-Appellee, Case No. 12-31109, ECF No. 00512289805, at 22.
- "The first contract (Exh. 700) is the bareboat charter by which ACL turned over possession of the PAM D to DRD for a specified three-year period." *Id*. at 29.
- "There is no evidence that this contract between ACL and DRD was anything other than a valid bareboat charter." *Id*. at 29.
- "Under the bareboat charter, DRD had exclusive possession and control of the vessel . . . ." *Id*. at 30.
- "DRD became the owner *pro hac vice* of the vessel, taking on all legal responsibilities as owner." *Id*. at 30.
- "DRD, now the owner *pro hac vice* of the vessel by virtue of the bareboat charter, time chartered the vessel to ACL on a fully found basis." *Id*. at 31. *See also id.* at 42.
- "DRD became owner *pro hac vice* of the vessel and all that ACL did was provide dispatch instructions under the time charter . . . . This does not negate the existence of the bareboat charter." *Id*. at 40.
- "The District Court . . . correctly concluded: 'For earlier stated reasons, there was a valid bareboat charter that invested DRD with ownership *pro hac vice* along with a valid time charter that recognized DRD's status as 'owner' vis-à-vis ACL's charterer position in the latter charter.'" *Id*. at 44.

19

negligence of the master or crew contributed to the collision." *Probo II London v.*

*ISLA SANTAY MV*, 92 F.3d 361, 365 (5th Cir. 1996).[12]  Further, providing a

competent crew is a non-delegable duty of the vessel owner.  *Empire Seafoods v.*

*Anderson*, 398 F.2d 204, 210 (5th Cir. 1968).  ACL could only be relieved of this

responsibility by a valid bareboat charter:

> There is no support for this thesis that the mere surrender of control of
> a vessel absolves its owner.  If a shield is possible, it can be provided
> only by a valid bareboat charter.

*Baker v. Raymond Int'l, Inc.*, 656 F.2d 173, 182 (5th Cir. 1981).  *See also* ACL

Post Trial Br., ROA.17162 ("It is established maritime law that an owner of a

vessel bareboat chartered to another is not liable for the negligent navigation of the

crew provided by the bareboat charterer.").[13]  To come within this law, ACL

(successfully) argued that the charters were valid, not merely that they were

intended to be valid.

Finally, ACL did not argue to the district court (which, of course, was

familiar with what ACL had in fact argued and what that court had in fact ruled)

that its positions could be reconciled in this way.  *See generally* ACL Reply Trial

---

[12]    ACL certainly agrees with this proposition of law, as it has argued that the
TINTOMARA interests were liable on this basis.  ROA.17136-17137.

[13]    Further down on page 16, still its Summary of Argument, ACL incorrectly claims "it
made no difference to ACL's liability whether the agreements were valid charters or whether
they were void *ab initio*" because the district court "found that there was no act or omission of
ACL's which caused or contributed to the collision." Br. 16.  This fails for the same reason just
discussed:  the Court only found that ACL had no liability *because* "a valid bareboat charter []
invested DRD with ownership *pro hac vice*," relieving ACL of certain duties as owner.
ROA.17869.

Memorandum, beginning ROA.18672.  This Court may therefore deem the

argument to be waived.  *See, e.g.*, *French*, 637 F.3d at 582-83.

### 2.     There Is No "Non-Disclosure" Requirement.

ACL argues that there must have been a "non-disclosure" in order for

judicial estoppel to apply, citing one of this court's cases where a party was

estopped from asserting a claim based on that party's failure to disclose the claim

in a prior bankruptcy.  Br. 20-22 (citing *In re Superior Crewboats*, 374 F.3d at

335).  That case is part of the line of cases where a party was estopped from

asserting a claim where it had previously failed to disclose the claim as an asset in

a bankruptcy, even though it was legally required to do so.  *See In re Superior*

*Crewboats,* 374 F.3d at 332-334; *Browning Mfg.*, 179 F.3d at 210 ("Our review of

the jurisprudence convinces us that, in considering judicial estoppel *for bankruptcy*

*cases*, the debtor's failure to satisfy its statutory disclosure duty is 'inadvertent'

only when, in general, the debtor either lacks knowledge of the undisclosed claims

*or* has no motive for their concealment.") (emphasis in original).  Yet judicial

estoppel is by no means limited to situations where a party has failed to make a

legally-required disclosure.  *See, e.g.*, *New Hampshire*, 532 U.S. 742; *Republic of*

*Ecuador*, 708 F.3d 651; *Hall*, 327 F.3d 391.  None of these cases involve a non-

disclosure, yet a party was judicially estopped in each.

In *New Hampshire*, for example, the Supreme Court addressed the second of two border disputes between New Hampshire and Maine, having heard both as matters of original jurisdiction.  532 U.S. at 746-49.  During the 1970s dispute, New Hampshire had advocated multiple interpretations of the term "Middle of the River" in a 1740 border decree.  *Id*. at 747, 752.  Ultimately, however, New Hampshire and Maine entered a consent decree, endorsed by the Court, which accepted one particular meaning of the term and fixed a portion of the border accordingly.  *Id*. at 747, 752.  In the 2000 suit, New Hampshire asked the Court to apply a different interpretation (its preferred interpretation from the 1970 dispute) of the same term in the same decree to set a different portion of the border.  *Id*. at 747-48, 752.

The Court held that judicial estoppel barred New Hampshire's asserting this position, *id*. at 755, 756, even though all of New Hampshire's positions were indisputably "fully disclosed," *see* Br. 22, to the Court.  The Court explained:

> Having convinced this Court to accept one interpretation of "Middle of the River," and having benefited from that interpretation, New Hampshire now urges an inconsistent interpretation to gain an additional advantage at Maine's expense. Were we to accept New Hampshire's latest view, *the "risk of inconsistent court determinations" would become a reality*. We cannot interpret "Middle of the River" in the 1740 decree to mean two different things along the same boundary line *without undermining the integrity of the judicial process*.

*Id.* at 755 (citation omitted) (emphases added).  ACL's shifting position poses the same problems as in *New Hampshire*:  inconsistent court determinations that would undermine the integrity of the judicial process.

>  3.  *The "Context of the Consolidated Action" Does Not Change that ACL Seeks Two Inconsistent Determinations.*

ACL asked the district court to issue two directly inconsistent determinations in its favor.  A declaration that the charters never existed (i.e., were void *ab initio*) negates the basis on which ACL prevailed in the limitation actions.  Nothing about the "context of the consolidated actions" resolves this fundamental conflict.

ACL suggests that, because it was arguing in the alternative in the limitation trial, it should not be judicially estopped.  *See* Br. 22-28.  Undoubtedly, a party may argue in the alternative, until it prevails on one argument.  *See, e.g.*, Fed. R. Civ. P. 8(d)(2).  Once a party succeeds in having a court accept a particular position, however, inconsistent alternative arguments are foreclosed to that party. *See, e.g.*, *New Hampshire*, 532 U.S. at 749 (judicial estoppel "generally prevents a party from prevailing *in one phase of a case* on an argument and then relying on a contradictory argument to prevail *in another phase*") (emphasis added).  *See also Gore v. El Paso Energy Corp.*, Case No. 02-1008, 2008 U.S. Dist. Lexis 9684, *4-5, n.2 (M.D. Tenn. Feb. 8, 2008) (rejecting plaintiffs' characterization of an argument contrary to one previously made to and adopted by the Sixth Circuit to

his advantage as "arguing in the alternative"). Further, as the district court pointed

out, the argument that New Hampshire was barred from making in *New Hampshire*

had been New Hampshire's preferred alternative argument in the 1970s border

dispute before it entered into the consent decree. ROA.18797 (citing *New*

*Hampshire*, 532 U.S. at 755-56).

This Court should also reject ACL's argument that it may seek two

fundamentally inconsistent judgments because it was not able to raise an

"alternative defense" in the limitation action. This claim is not true as a matter of

fact. It is also irrelevant to the judicial estoppel inquiry.

Specifically, ACL claims that the stay in the declaratory judgment action

prevented it from arguing in the limitation action that DRD, comparable to a pirate

or thief, was in illegal possession of the MEL OLIVER (because the charters were

fraudulently induced and void) at the time of the collision, relieving ACL of

liability as vessel owner. Br. 24-27. ACL maintains that, because its "alternative

defense" was "subject to a stay," it was "forced to defend" with "the only position

ACL was allowed to argue." Br. 24, 27. Yet the stay of the declaratory judgment

action stayed *nothing* in the limitation action, and ACL in fact *did* assert the

defense it now claims it was prohibited from asserting, as discussed below.

Further, ACL has cited nothing in the record showing that the district court

prohibited or limited its ability to present evidence or arguments related to this

24

defense.  Nor does ACL explain how, as a practical or theoretical matter, a defense

to a claim *even could be* stayed while that claim is tried to a final judgment.

First, the stay of the separate declaratory judgment action did not stay any

issues in the limitation trial.  The stay was put in place under two procedural rules

intended to allow the issues of the limitation/interpleader action to be resolved

without the interference of a decision in another action, not to limit what could be

tried in the limitation/interpleader.[14]  *See* Fed. R. Civ. P. Supp. R. F(3); 28 U.S.C.

§ 2361.[15]  Certainly nothing in the text of the stay order extends it to overlapping

issues in the limitation action.  *See* ROA.13604-13611.  ACL's argument that the

stay of the declaratory judgment issued under Supplemental Rule F(3) and 28

U.S.C. § 2361 restrains overlapping issues in the limitation and interpleader

actions would turn these rules on their heads.

Second, ACL did not treat this "alternative defense" as stayed during the

limitation trial.  Indeed, ACL, jointly with the other parties, identified the validity

of the charters as one of the issues of law to be determined in that trial:

---

[14]    Indeed, the district court concluded that the stay applied because the "declaratory judgment action would address issues involving the contractual relationship between ACL and DRD which would *necessarily bear* on the [limitation] action."  ROA.13608 (emphasis added).

[15]    Specifically, the declaratory judgment action was stayed both by the order entered under Federal Rule of Civil Procedure Supplemental Rule F(3) at the inception of the limitation actions, staying and enjoining the further prosecution of other claims against the vessel owners arising from the casualty, *see* Order, Case No. 08-4261, ECF No. 4, at 3, and due to the interpleader under 28 U.S.C. § 2361, *see* ROA.13608.

(75)  Whether ACL is entitled to void its contracts with DRD by showing that DRD intended to breach the manning requirements of the charters at their inception.

ROA.13705 (Pretrial Order).  Furthermore, we know that ACL did not believe this defense to be stayed because it *did* assert the allegedly-stayed defense in the limitation trial—as a defense to *in rem* liability for the MEL OLIVER. ROA.17328-17329.  ACL made a strategic decision to raise its "unlawful possession" defense only to defend the MEL OLIVER against *in rem* liability, and to rely on the (much more well-established) defense that valid charters made DRD the owner *pro hac vice* to defend itself against *in personam* liability as vessel owner.  No stay caused ACL to assert the defense against one claim but not the other.[16]

Third, ACL's alternative defense—stayed or not—is simply irrelevant. Regardless of its reasons, ACL did assert a defense based on the existence of valid charters, and the Court accepted this defense.  Had ACL wanted to maintain the ability to argue that the charters were void *ab initio* in the declaratory judgment action, it could have refrained from urging a defense based on the charters.  It did not refrain, however, and it prevailed on that argument, foreclosing future inconsistent arguments.

---

[16]     Further, ACL never mentioned to the district court any supposed belief or concern that it was being forced to forfeit a defense by operation of the stay in another case.  Instead, it forcefully advocated a meritorious (and legally well-established) defense to *in personam* liability based on the existence of the charters.

Regardless of the procedural background and the reasons ACL chose to pursue the strategy it did, the requested ruling that the charters are void *ab initio* would undoubtedly be inconsistent with the limitation decision, and asking a court to issue a judgment that directly contradicts a prior judgment is damaging to the appearance of integrity in the judicial process. *See New Hampshire*, 532 U.S. at 755. Finally, although ACL may not be playing "fast and loose" in the sense that it is hiding its objectives,[17] it *is* asking the Court to endorse two different and incompatible states of fact. Ultimately, the district court was familiar with the procedural posture of the various consolidated actions and what was stayed in them, the arguments ACL had made at various points during the cases, and the bases of its own rulings. With this background, it determined that judicial estoppel applied, specifically rejected ACL's arguments about arguing in the alternative in the context of the consolidated action, *see* ROA.18797-18798, and specified two of the policy rationales underpinning judicial estoppel that were implicated in this case. This ruling was not an abuse of discretion.

---

[17]    On the other hand, ACL did assert to the district court in its opposition to the motion to enforce the stay of the declaratory judgment action that there were no material common questions of fact between the declaratory judgment action and the limitation/interpleader actions, *see* ROA.10459, 10462-10464, while it now claims that the declaratory judgment action overlapped fully with its "first defense," *see* Br. 24, in the limitation actions.

**B.    Even Should the Court Disagree with the District Court's Application of Judicial Estoppel, ACL's Complaint Fails as a Matter of Law.**

Even if this Court reverses the district court's application of judicial estoppel, the Court need not remand the case for factual determination on the merits of the alleged fraud in the inducement because ACL's Complaint fails as a matter of law:  neither the alleged fraud in the inducement, nor DRD's regulatory violations, can render the charters void *ab initio*.

*1. Governing Law.*

The United States agrees with ACL that maritime law applies to this matter. *See* Br. 28.  The United States likewise agrees that this Court should look, in the absence of applicable maritime precedent, to ordinary federal common law and the general principles of contract law as expressed by the Restatement (Second) of Contracts.  *Id*. at 29 (citing *Lytal Enter. Inc. v. Newfield Exploration Co.*, Case No. 06-0033, 2006 WL 2990124, at *6 (E.D. La. Oct. 18, 2006)).

*2. Fraud in the Inducement Is Legally Insufficient To Support a Declaration that the Charters are Void ab Initio.*

The type of fraud alleged by ACL (fraud in the inducement) merely renders a contract voidable, not void from the start.  A voidable contract is operative until the defrauded party chooses to exercise a power of avoidance, as discussed below. Exercising the power of avoidance does not render the agreement void from the start, *i.e.* void *ab initio*, but only void from the point at which avoidance is

28

exercised.  Therefore, the fraud alleged by ACL does not, as a matter of law, support the declaratory judgment it seeks.

Traditional common law principles and the Restatement (Second) of Contracts recognize two types of fraud that can occur in the procurement of a contract:  fraud in the inducement and fraud in the factum (also called fraud in the execution).  Where the fraud is in the inducement, "the defrauded person is induced into a transaction that he understands or reasonably should understand." *Id*.  In contrast, fraud in the factum is fraud which represents an instrument to be something radically different from what it is.  Corbin on Contracts § 28.22.  Here, ACL has alleged fraud in the inducement only.  ROA.22024 ¶¶ 31-33.

Fraud in the factum "creates a transaction that is void."  Corbin on Contracts § 28.22.  *See also* Restatement (Second) of Contracts § 163.  Fraud in the inducement, on the other hand, "renders a transaction voidable rather than void." Joseph M. Perillo, Corbin on Contracts (rev. ed. 2002) § 28.22.  *See also* Restatement (Second) of Contracts § 164.  Where a contract is voidable, the defrauded party has the options of ratifying (also called affirming) the contract and suing for damages, or of avoiding the contract (also sometimes called disaffirmance or unilateral rescission) and seeking restitution.  *See, e.g.*, Restatement (Second) of Contracts § 7 (1979) (stating that a voidable contract "is one where one or more parties have the power, by a manifestation of election to

avoid the legal relation created by the contract, or by ratification of the contract to extinguish the power of avoidance"); Corbin on Contracts §§ 1.6, 28.23.

A voidable contract remains operative until the party which has the power of avoidance elects to exercise it. As explained in Corbin:

> The rules of common law provide that contracts are voidable at the option of one of the parties under certain circumstances, such as infancy, mistake, duress, or fraud. *In such cases, the contract is operative until the injured party disaffirms it.* The timely exercise of the power of avoidance discharges the unperformed duties of both parties.

13-68 Corbin on Contracts § 68.9[6] (emphasis added). *See also* Corbin on Contracts § 67.8 (referring to avoidance as a type of *discharge*). Murray on Contracts makes the same point: "Until the party who has the power of avoidance elects to exercise it, the contract remains intact." John Edward Murray, Jr., Murray on Contracts (5th ed.) § 18 (2011). Further, "[i]f a party is induced to enter into a contract by fraud, *there is a contract*, but the fraudulent representations of the other party give the defrauded party a power of avoidance or disaffirmance." *Id.* (emphasis added). By contrast, "[u]*nlike a voidable contract that is a contract until avoided*, a 'void contract' never was a contract since there was never any legal obligation." *Id.* (emphasis added).[18]

---

[18]     *See also* 17A Am. Jur. 2d Contracts § 10, stating:

A voidable contract . . . is one as to which one or more of the parties have the power, by a manifestation of election to do so, to avoid the legal relations created by the contract or to extinguish the power of avoidance by ratifying the contract.

While in many cases, the difference between a void and voidable contract may be of little relevance, whether there was ever a contract (voidable) can be of great importance regarding the rights of third parties.[19]  "The principal significance of the distinction between fraud in the *execution* or *factum*, which precludes the formation of any contract, and fraud in the *inducement*, which creates a contract that is voidable by the victim of the fraud, relates to the rights of third parties." Murray on Contracts § 95.  For example, regarding property "subsequently transferred to a bona fide purchaser for value, the defrauded party may recover the property only if the initial transaction was void."  Corbin on Contracts § 28.22. ACL's theory underlying this case is similarly intended to affect the rights of a third party (*i.e.*, the United States' right to recover under OPA).  The difference between a void and a voidable agreement is therefore of great significance here, and ACL's charters with DRD are, at most, voidable.

ACL's argument that fraud in the inducement can render a contract void *ab initio*, at Br. 29-30, consists solely of discussion of two inapplicable doctrines:  the general duty of good faith and fair dealing in maritime contracts, and the duty of utmost good faith, also known as *uberrimae fidei*.  As the United States pointed out

---

Accordingly*, a voidable contract is valid and binding until it is avoided* by the party who is entitled to avoid it. (emphasis added).

[19]     Courts frequently use the terms "void" and "voidable" loosely, because, as one treatise notes, "seldom is the distinction between void and voidable of importance."  Joseph M. Perillo, Calamari & Perillo on Contracts (6th ed.) § 9.22 (2009).

in its briefing in the district court, neither of these doctrines is applicable in this case—the first is an *implied contract term* that does not apply to contract formation[20] and the second is a heightened disclosure requirement upon parties seeking to enter insurance contracts.[21]  ACL has declined to make any arguments to this Court regarding why either of these two doctrines applies in this case or support the conclusion that the charters are void *ab initio*.

      2.     *Likewise, DRD's Alleged Intent to Violate Regulations in Breach of the Charters is Insufficient, as a Matter of Law, To Render the Charters Void as "Illegal Contracts."*

ACL also claims[22] that DRD's alleged intention to violate Coast Guard vessel-manning regulations, in breach of the charters, turns otherwise-valid

---

[20]     *See* Restatement (Second) of Contracts § 205 ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.").  The duty of good faith and fair dealing does not extend to misconduct during contract formation, which is subject to other rules, including the rules relating to fraud discussed above.  *Id.* at § 205 and cmt. c.

[21]     As explained in *Knight v. U.S. Fire Ins. Co.*, *uberrimae fidei* is based in insurance policy:

> It is well-established under the doctrine of *uberrimae fidei* that the parties to a marine insurance policy must accord each other the highest degree of good faith.  This stringent doctrine requires the assured to disclose to the insurer all known circumstances that materially affect the risk being insured.  Since the assured is in the best position to know of any circumstances material to the risk, he must reveal those facts to the underwriter, rather than wait for the underwriter to inquire.

804 F.2d 9, 13 (2d Cir. 1986).  An underwriter may void a policy *ab initio* based on an assureds failure to meet this standard.  *Id.  But see Albany Ins. Co. v. Kieu*, 927 F.2d 882, 889 (5th Cir. 1991) (*uberrimae fidei* not entrenched federal precedent).  ACL has cited no case applying *uberrimae fidei* to a non-insurance maritime contract.  The United States has found none.

[22]     ACL did not plead any claim that the contracts were "illegal" or contrary to public policy.  Its sole claim was fraud in the inducement of the contracts.  ACL maintains that it is entitled to proceed on this claim despite its failure to plead it or amend its Complaint because, prior to the United States' intervention, it raised the argument in its Motion for Partial Summary Judgment

charters into "illegal contracts" which are void.  Even if ACL's allegations about

DRD's intentions are taken as true, this claim fails as a matter of law.  There is no

law that supports finding that an intention to *breach* a contract in a way that is

illegal renders the contract itself "illegal" or contrary to public policy.[23]  Likewise,

agreements that are contrary to public policy are not necessarily void:  they may

also be fully enforceable despite the illegality, partially enforceable, or

unenforceable although not void.[24]  *See* Restatement (Second) of Contracts §§ 178-

84.  The category of void agreements "is generally reserved for a handful of

contracts that are seen as being in fundamental violation of public policy, such as

agreements to do acts that both parties know will constitute a felony, or wagering

---

and DRD failed to object.  *See* ROA.18712-18713.  There is no need to remand the matter, regardless of whether the claim is preserved, because it fails as a matter of law.

[23]    Under the Restatement (Second) of Contracts, "illegal contracts" are treated under the rubric of agreements contrary to public policy.  Restatement (Second) of Contracts §§ 178-84.  Generally, The Restatement (Second) "avoids the common characterization of [promises or terms unenforceable on grounds of public policy] as 'illegal.'" Restatement (Second) Intro. Note Ch. 8, Topic 1.  Instead, it "is concerned with whether a promise is enforceable and not with whether some other sanction has been attached to the act of making or performing it in such a way as to make that act 'illegal.'"  *Id.*

[24]    *See also* Restatement (Second) of Contracts, § 8 cmt. b ("Some contracts are unenforceable because they arise out of illegal bargains which are neither wholly void nor voidable.").  As explained in Murray on Contracts:

> Sometimes "void contracts" are referred to as "illegal contracts."  While public policy may dictate that a particular bargain has all the earmarks of a contract receive no legal sanction whatsoever because the bargain, if performed, would result in an illegal act, the phrase "illegal contract" used synonymously with "void contract" may be inaccurate.  While certain illegal bargains are clearly "void" in the sense that there is no legal sanction attached to them, there are certain kinds of "illegal contracts" that are merely voidable bargains.

Murray on Contracts § 18.

agreements made in jurisdictions where gambling is illegal." *United States ex rel.*

*Siewick v. Jamieson Science & Eng'g, Inc.*, 214 F.3d 1372, 1377 (D.C. Cir. 2000)

(internal citations omitted).

ACL's allegations do not fall into any of the typical categories of contracts

that may be contrary to public policy; that is, situations where "the performance

that is bargained for is against public policy," where "the making of such a contract

is against public policy," or where a lawful and proper performance is in

furtherance of a purpose contrary to public policy. Corbin on Contracts §§ 79.1,

89.2, 89.3. ACL cites, at Br. 35, *In re Cromer (Krohn v. Orta)*, a bankruptcy case

from the Eastern District of New York, to support its argument that DRD's

undisclosed alleged intention to breach the charters by committing regulatory

violations in the course of their performance render the charters themselves illegal.

153 B.R. 391, 397 (E.D.N.Y. 1993) (applying New York law). But *Cromer* is

simply a case where the performance *that was bargained for*—that a corporate

officer would violate his fiduciary duties in exchange for a cash payment—was

against public policy. *Id.* at 397-98.[25] Further, the contract in *Cromer* was found

to be *unenforceable*, not void.

---

[25]    More specifically, the Trustee in the *Cromer* bankruptcy sought to enforce an alleged side agreement to a real estate transaction (despite lacking an executed copy of the alleged agreement). *Id.* at 393. Mr. Cromer, the debtor in the bankruptcy, had signed a contract (as President of Cromco Corp.) to sell real property belonging to Cromco Corp. to another corporation. *Id.* at 392-93. Mr. Cromer also claimed to have signed a side agreement with Mr. Orta, the owner of the corporation purchasing the property, under which Orta would pay Cromer,

ACL has further not explained why, presuming a unilateral, undisclosed

intention to breach the charters by violating the law were to be viewed as making

the charters themselves contrary to public policy, this would render the charters

void, as opposed to unenforceable, partially unenforceable, or even fully

enforceable.  *Cf.* Restatement (Second) of Contracts §§ 178-84.  *See also Siewick*,

214 F.3d at 1377.  ACL cites, at Br. 35, *Baker v. Raymond Int'l, Inc* , but in that

case the very formation of the charter between the two particular contracting

parties was prohibited by federal regulation.[26]  656 F.2d 173, 181-82 (5th Cir.

1981).  Likewise, in *Kaiser Steel Corp. v. Mullins*, § 8(e) of the National Labor

Relations Act declared certain types of agreements "void."  455 U.S. 72, 77 (1982)

(otherwise discussing the issue in terms on unenforceability).

---

personally, an additional $200,000.  *Id.*  The Trustee sought to collect this $200,000 from Orta as an asset of the estate.  *Id.* at 394.

Orta disputed that this side agreement existed and also argued that "the agreement would be unenforceable as an illegal contract lacking consideration on the part of the Debtor."  *Id.*  The Trustee argued that there was "disguised consideration" in that Cromer "diminished the true value of the property" in exchange for the payment.  *Id.* at 397.  The bankruptcy court held that it would not enforce such an agreement (presuming it existed) because it was based on illegal consideration (diminishing the property value in violation of Cromer's duties to the corporation).  *Id.* at 397-98.

[26]     Specifically, the Maritime Administration had prohibited "demise or bareboat charters" to aliens, yet the defendant in *Baker* had nonetheless purported to charter its vessel to an alien.  *Id.*  When a seaman was injured aboard that vessel, the vessel owner argued it was not liable as owner because the bareboat charter prohibited by the Maritime Administration nonetheless made the alien the owner *pro hac vice* of the vessel.  *Id.* at 175, 181-82.

**C.    If Necessary, the District Court Should Issue Findings in the First Instance Regarding Whether DRD Committed Fraud in the Inducement.**

Because the district court found that ACL was estopped from seeking to have its charters declared void *ab initio*, it issued no findings of fact regarding whether DRD committed fraud in the inducement.  While this Court need not reach this issue if it affirms the district court's ruling, in the event that it does not, the United States respectfully submits that it is the role of the district court to make the required factual findings in the first instance.

ACL nonetheless asks this Court to make the factual findings that the elements of fraud in the inducement are met, including fraudulent intent, based on eleven findings of fact from the limitation trial which it lists in its brief.  Br. 36-38.  First, finding these ultimate facts (and any necessary predicate facts) is the district court's role, regardless of whether it has already made some of the subsidiary factual findings.  Second, the factual findings listed by ACL are—by themselves— insufficient to make the additional factual findings requested by ACL.

As Federal Rule of Civil Procedure 52(a) provides, "[i]n an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately."  Further, "[factfinding] is the basic responsibility of district courts, rather than appellate courts, and . . . the Court of Appeals should not [] resolve[] in the first instance [] factual dispute[s] which ha[ve] not been

considered by the District Court." *Pullman-Standard, Div. of Pullman v. Swint*,

456 U.S. 273, 291-292 (1982) (quoting *DeMarco v. United States*, 415 U.S. 449,

450, n.* (1974)). *See also Anderson v. Bessemer City*, 470 U.S. 564 (1985) ("The

trial judge's major role is the determination of fact, and with experience in

fulfilling that role comes expertise."); *Mucha v. King*, 792 F.2d 602 (7th Cir. 1986)

(noting that Rule 52(a) rests "on notions of the proper division of responsibilities

between trial and appellate courts").

In this case, to establish fraud in the inducement, ACL must establish that:

(1) the deceiving party made a material misrepresentation or
nondisclosure, (2) the representation was false or the nondisclosure
implied that the facts were different from what the deceived party
understood them to be, (3) the deceiving party knew that the
representation was false or that the nondisclosure implied the
existence of false facts, (4) the deceiving party intended the deceived
party to rely on the misrepresentation or nondisclosure, and (5) the
deceived party detrimentally relied upon the misrepresentation or
nondisclosure.

*Black Gold Marine Inc. v. Jackson Marine Co., Inc.*, 759 F.2d 466, 470 (5th Cir.

1985).[27] The district court has not yet made findings regarding whether any of

---

[27]     The test is the same for either fraud in the inducement or fraud in the factum. *Black Gold Marine* does not reach the issue of whether the fraud in that case was in the factum or in the inducement, and therefore does not address the difference between void and voidable agreements. The issue may not have been squarely presented to that court or relevant to the parties. Plaintiff had alleged fraud and requested the district court declare the contract "null and void," which the court did. *Black Gold Marine*, 759 F.2d at 471, 467. Yet, the term "null and void" is not a legal term of art in this context. Rather, the term often appears in contracts to signify, variously, a power to cancel, *e.g.* Corbin on Contracts §§ 6.15, 68.9[5], a conditional duty, *e.g. id.* § 31.1, a liquidated damages provision, *e.g. id.* § 65.33, and a condition subsequent, *e.g.*, *id.* § 86.10. In none of these contexts is the contract considered to be void *ab initio*, even once the "null and void" provision is applied. *Id.* §§ 6.15, 31.1, 65.33, 68.9[5], 86.10. *See also*

these elements were satisfied, and it is the district court that should make these findings. Moreover, the district court is in a better position to make the findings, especially on the key issue of fraudulent intent. The district judge presided over the nine-day bench trial on which the parties agreed that this case could be determined, is familiar with that record, and, having seen the witnesses testify live, is better equipped to assess the demeanor and veracity of those witnesses.

Nor do the eleven findings listed by ACL establish—in and of themselves—the five elements of fraud listed above. The findings relate to various incidents of negligence and regulatory violations by DRD or its crews, and they certainly paint a vivid picture of the poor safety culture at DRD. Br. 37-38. But these findings do not go to whether, at the time the charters were formed in August 2007, DRD intended to breach the contracts' crewing and compliance terms and therefore made a misrepresentation by entering the agreement,[28] nor to whether DRD

---

*id.* at § 40.10. Indeed, it is difficult to determine whether the court was using "null and void" to express that the contract was void *ab initio* or was simply a voidable contract that had been avoided. The fraud alleged in the *Black Gold Marine* was that one master deceived the other about the *actual contents* of the contract. This is classic fraud in the factum which should have rendered the agreement void from the start, but the appellate court also addressed the defendant's alternative argument that the contract was a voidable agreement that had been affirmed. 759 F.2d at 468-69, 471.

[28] There is also an open issue of maritime law regarding whether a misrepresentation of an intention to perform an agreement expressed solely through the making of the agreement can render a contract voidable or merely gives rise to a tort action for fraud in addition to any breach of contract claims. *Compare Bridgestone/Firestone v. Recovery Credit Servs.*, 98 F.3d 13, 19-20 (2d Cir. 1996) (discussing New York law), *with Hall's Reclamation v. APAC Carolina*, Case No. 95-2870, 1996 U.S. App. LEXIS 33040, *7-8 (4th Cir. 1996) (discussing South Carolina law). *See also* Williston on Contracts § 69:42 (discussing the issue in the context of insolvent buyers).

intended to deceive ACL in this manner. *See also United States v. Shah*, 44 F.3d 285, 293 n.14 (5th Cir. 1995) ("Generally, there is no inference of fraudulent intent not to perform from the mere fact that a promise made is subsequently not performed."). There is testimony and evidence in the trial record besides these findings from which the district court may draw to make the ultimate findings of fact regarding whether the elements of fraud are met.

> ### D.    The Denial of ACL's Partial Motion for Summary Judgment is Not Before this Court.

Should this Court reverse the district court's judicial estoppel ruling, the Court will lack jurisdiction to review the earlier denial of partial summary judgment, ROA.21681. *See, e.g.*, *Gonzalez v. Trinity Marine Group*, 117 F.3d 894, 899 (5th Cir. 1997) (dismissing for want of appellate jurisdiction that portion of the appeal seeking review of the denial of plaintiff's motion for partial summary judgment, following reversal on appeal of the district court's order dismissing plaintiff's complaint as a sanction); *Jackson v. City of Atlanta*, 73 F.3d 60, 62 (5th Cir. 1996) (while the Court had jurisdiction to review the purely legal aspects of a denial of qualified immunity to a § 1983 claim, there was no appellate jurisdiction to also review the denial of motions to dismiss and for summary judgment). *See also Pedraza v. Shell Oil Co.*, 942 F.2d 48, 55 (1st Cir. 1991) ("The interlocutory

---

The United States has not located a general maritime law case addressing this question, and has not taken a position on the question.

orders challenged on Shell's cross-appeal are not within any exception to the final judgment rule and implicate no issue related to the resolution of the appeal from the final order granting Shell's motion for summary judgment on the preemption ground."); *Johnson v. Greater Southeast Community Hosp. Corp.*, 951 F.2d 1268, 1277 (D.C. Cir. 1991) (declining, after overturning dismissal of Complaint for lack of ripeness, to also review denial of plaintiff's partial motion for summary judgment because the "denial of a motion for summary judgment is not a reviewable final decision").

Likewise, review of factual issues on the earlier summary judgment record is not appropriate given the existence of the fuller trial record that the parties agreed govern this matter. *Cf. Downey v. Denton County*, 119 F.3d 381, 385 (5th Cir. 1997) ("We do not review the denial of the motion for summary judgment which is followed by a full trial on the merits."); *Black v. J.I. Case Co.*, 22 F.3d 568, 569 (5th Cir. 1994).

Nor did the district court err in denying ACL's motion for partial summary judgment. While ACL maintains that DRD's guilty plea establishes fraudulent intent, that plea admits only that DRD committed sporadic crewing violations during a period of time when there was a recognized shortage of licensed masters. It does not address whether DRD intended to violate the PAM D/MEL OLIVER charters when it entered into them, nor whether it had intent to deceive ACL. *See*

40

*Black Gold Marine*, 759 F.2d at 470.  At a minimum, Daniel Dantin's affidavit created a factual issue regarding these questions.  *See* ROA.22591 (order denying partial summary judgment and quoting Dantin declaration).  The district court did not err in finding that material factual issues existed and denying the motion.

## CONCLUSION

For the reasons stated above, the district court's judgment should be affirmed.

Respectfully submitted,

By:    /s/ Sarah S. Keast
Sarah S. Keast
Michael A. DiLauro
Trial Attorneys
U.S. Department of Justice
Torts Branch, Civil Division
P.O. Box 14271
Washington, D.C. 20044-4271
Tel:  (202) 616-4039
Fax:  (202) 616-4159
Email:  sarah.keast@usdoj.gov
*Counsel for Intervenor-Appellee*
*United States of America*

# CERTIFICATE OF FILING AND SERVICE

I hereby certify that on December 6, 2013, I electronically filed the

foregoing Appellee's Brief with the Clerk of Court using the CM/ECF System,

which will send notice of such filing to the following registered CM/ECF user:

Glenn G. Goodier
Richard David Bertram
Plaintiff - Appellant
Jones Walker LLP
201 Saint Charles Avenue
New Orleans, LA 70170-5100
504-582-8174
504-582-8334
ggoodier@joneswalker.com
rbertram@joneswalker.com

John A.V. Nicoletti
Terry Lee Stoltz
Nicoletti, Hornig & Sweeney
88 Pine Street
Wall Street Plaza
New York, NY 10005-0000
212-220-3830
212-220-3780
jnicoletti@nicolettihornig.com
tstoltz@nicolettihornig.com

Randolph Jean Waits
Waits, Emmett & Popp, L.L.C.
1515 Poydras Street
New Orleans, LA 70112-0000
504-581-1301
504-581-1796
rwaits@wep-law.com

  /s/ Sarah S. Keast
Sarah S. Keast
Trial Attorney
U.S. Department of Justice
Torts Branch, Civil Division
P.O. Box 14271
Washington, D.C. 20044-4271

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

### *(PLACE THIS AS LAST DOCUMENT IN YOUR BRIEF BEFORE THE BACK COVER)*

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

    1.    This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because:

■    this brief contains 10,959 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii), *or*

☐    this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

    2.    This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because:

■    this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman, *or*

☐    this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

(s)  Sarah S. Keast
Attorney for Appellee United States of America
Dated:  February 22, 2011

(PLACE THIS AS LAST DOCUMENT IN BRIEF BEFORE BACK COVER)

1